IN THE SUPREME COURT
OF THE VIRGIN ISLANDS

**FILED**

May 19, 2025 10:49 AM
SCT-Civ-2024-0022
**VERONICA HANDY, ESQUIRE**
**CLERK OF THE COURT**

**For Publication**

# IN THE SUPREME COURT OF THE VIRGIN ISLANDS

THE VIRGIN ISLANDS GOVERNMENT
HOSPITAL AND HEALTH FACILITIES
CORPORATION including Roy Lester
Schneider Hospital and Medical Center Chief
Executive Officer Tina Commissiong; Chief
Medical Officer George Rosenberg, M.D.; and
Medical Executive Committee Members: Denita
Boschulte, M.D.; Yuri Peterkin, M.D.; Leroy
Sterling, M.D.; Frank Odlum, M.D.; Jessica
Wilson, M.D.; and Tai Hunt-Ceasar, M.D.,

    Appellants/Defendants,

v.

GLENDA WRENSFORD, M.D.,

    Appellee/Plaintiff.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

S. Ct. Civ. No. 2024-0022
Re: Super. Ct. Civ. No. 399/2024
(STT)

On Appeal from the Superior Court of the Virgin Islands
Division of St. Thomas & St. John
Superior Court Judge: Hon. Kathleen Mackay

Filed: May 19, 2025

Cite as: 2025 VI 12

BEFORE: **MARIA M. CABRET**, Associate Justice; **IVE ARLINGTON SWAN**, Associate Justice; and **HAROLD W.L. WILLOCKS**, Associate Justice.

APPEARANCES:

**Sean P. Bailey, Esq.**
Assistant Attorney General
Virgin Islands Department of Justice
St. Croix, U.S.V.I.
    *Attorney for Appellants/Defendants,*

**Glenda Wrensford, M.D.**
Pro se
St. Thomas, U.S.V.I.
    *Appellee/Plaintiff.*

## OPINION OF THE COURT

**WILLOCKS, Associate Justice.**

*VIGHHFC et al. v. Wrensford*
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 2 of 44

2025 VI 12

¶ 1    Appellants Virgin Islands Government Hospital and Health Facilities Corporation (hereinafter "VIGHHFC"),[1] including Roy Lester Schneider Hospital and Medical Center (hereinafter "RLSH") Chief Executive Officer Tina Commissiong, Esq.; RLSH Chief Medical Officer George Rosenberg, M.D.; and RLSH Medical Executive Committee Members: Denita Boschulte, M.D.; Yuri Peterkin, M.D.; Leroy Sterling, M.D.; Frank Odlum, M.D.; Jessica Wilson, M.D.; and Tai Hunt-Ceasar, M.D. (collectively "Hospital Party")[2] appeals from the Superior Court of the Virgin Islands ("Superior Court") March 1, 2024 memorandum opinion and the accompanying order in which the court granted a preliminary injunction in favor of appellee Glenda Wrensford, M.D.

## I. BACKGROUND

¶ 2    On May 4, 2023 at approximately 1:00 a.m., Dr. Wrensford, the on-call general surgeon for RLSH at that time, was called to perform an emergency procedure on an emergency department patient (hereinafter "Patient").[3] Based on her review of the CT scan images of the Patient's chest

---

[1] In 1994, the Virgin Islands Legislature enacted the Virgin Islands Government Hospitals and Health Facilities Corporation Act, 19 V.I.C. § 240 et seq., *see* Act No. 6012 (V.I. Reg. Sess. 1994), which "created the Virgin Islands Government Hospitals and Health Facilities Corporation." 19 V.I.C. § 243(a). "The corporation [has] two district governing boards, one for the District of St. Croix and one for the District of St. Thomas-St. John," and the district governing boards are required to "formulate and determine hospital policy and planning for health care delivery for their respective districts consistent with the hospital policy and planning established by [VIGHHFC] Board of Directors." 19 V.I.C. §243(g).

Roy Lester Schneider Hospital and Medical Center—a hospital on St. Thomas—and "all personnel and equipment associated therewith," are under VIGHHFC's jurisdiction, 19 V.I.C. § 245(c), and thus, they are under the governance of the District of St. Thomas-St. John Governing Board of VIGHHFC (hereinafter "Board"). Accordingly, RLSH and its personnel are required to comply with the Board's by-laws, rules, and regulations in addition to RLSH's own by-laws, rules, and regulations—of relevance here, the Board's By-Laws, the RLSH Human Resources Department Administrative Policy and Procedure Manual, and the RLSH Medical Staff By-Laws.

[2] Given that VIGHHFC has the power to "sue and be sued" and has jurisdiction over RLSH and its personnel, *see* 19 V.I.C. §§ 244(a), 245(c), and that the remaining individuals were sued in their respective official capacities as personnel of RLSH—to wit, as officers and committee members of RLSH—rather than in their individual or personal capacities, this Court will herein refer to all the appellants collectively as the Hospital Party for the sake of simplicity and clarity.

[3] The parties do not dispute that Dr. Wrensford is a board-certified surgeon licensed to practice in the U.S. Virgin Islands.

*VIGHHFC et al. v. Wrensford*  2025 VI 12
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 3 of 44

that were erroneously uploaded depicting the left as the right and the right as the left, Dr. Wrensford incorrectly inserted a chest tube on the left side instead of the right side. Upon realizing that the images were mistakenly inverted when uploaded, Dr. Wrensford immediately corrected the tube placement by inserting another chest tube on the right side.[4] Dr. Wrensford left RLSH at approximately 4:00 a.m.

¶ 3    Dr. Wrensford returned to RLSH later that morning at approximately 9:00 a.m. and noticed that the Patient's left chest tube was not connected to suction as she had directed earlier that morning. Dr. Wrensford inquired with an emergency department nurse and was informed that the nurse had not gotten to it yet. At approximately 10:30 a.m., Dr. Wrensford checked on the Patient again and noticed that the left chest tube was still not connected to suction. The emergency department nurse and the emergency department doctor were made aware of the situation, and Dr. Wrensford left RSLH.

¶ 4    Later that same day, the emergency department staff made multiple calls to Dr. Wrensford requesting her to return to RLSH to evaluate the Patient due to the Patient's painful reaction when his chest tubes were connected to suction. When Dr. Wrensford did not immediately return as requested, the emergency department staff called Dr. Odlum—RLSH Chief of Surgery and Dr. Wrensford's direct supervisor—and advised him of the Patient's condition and that Dr. Wrensford had not returned to evaluate the Patient after being called.

¶ 5    Dr. Odlum, after he was done with his office patients, arrived at RLSH approximately 1.5 to 2 hours after the emergency department staff called him. Upon his arrival, Dr. Odlum found the Patient stable and not in distress; Dr. Odlum proceeded to evaluate the Patient. In describing his

---

[4] Dr. Wrensford indicated in her notes, entered on May 4, 2023 at 2:56 a.m., *inter alia*, that "[f]urther review of CT images revealed that images were loaded in reverse/flipped."

*VIGHHFC et al. v. Wrensford*     2025 VI 12
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 4 of 44

interaction with the Patient, Dr. Odlum later testified that he "didn't have to reinsert a tube or anything like that," that he "just troubleshoot[ed] the entire thing from beginning to the end to make sure that everything was appropriate[ly] set up, and then . . . hooked [up] a suction," and observed that the Patient "was fine" and "didn't have any more of the discomfort." Then, after confirming with the Patient that the Patient was not having any pain, Dr. Odlum "walked out." Dr. Odlum's contact with the Patient was so minimal that it was not recorded in the Patient's chart.

¶ 6     On the following day—May 5, 2023—several RLSH medical staff, including Dr. Wrensford, attended a root cause analysis meeting to discuss the placement of the chest tube on the wrong side of the Patient on May 4, 2023, which was considered a "sentinel event" under the 2023 Sentinel Event Policy of The Joint Commission[5] that required RLSH to "complete a thorough comprehensive systematic analysis (most commonly, a root cause analysis) to determine why the event occurred" and then "create a corrective action plan to prevent similar events from happening again, implement the plan, and monitor its effectiveness."[6] Despite the fact that the placement of the chest tube on the wrong side of the Patient was the sentinel event that warranted the root cause

---

[5] Founded in 1951, the Joint Commission, "[a]n independent, not-for-profit organization, . . . is the nation's oldest and largest standards-setting and accrediting body in health care." *See* https://www.jointcommission.org (last visited March 4, 2025).

[6] At the preliminary injunction hearing, the parties stipulated that the placement of the chest tube on the wrong side is listed as a sentinel event under The Joint Commission's 2023 Sentinel Event Policy:

> THE COURT: I understand. What I was trying to resolve here is if the defendants -- I got the impression -- let me start by saying that the reason that they are offering this document into evidence is to prove to the Court that the insertion of the tube on the wrong side is a sentinel event. I'm asking if the defendants agree that that is a sentinel event, does the plaintiff really need to have this unauthenticated document entered into evidence?

> ATTORNEY RUSSELL: We will agree that placing the tube on the wrong side of the patient is a sentinel event, and we don't need this.

> THE COURT: Let me ask the plaintiff. Do you still need this document in evidence if the defendants agree that placing a tube on the wrong side is a sentinel event?

> ATTORNEY GEORGE: Only to the event that placing the tube on the wrong side is listed, because they have a list of specific sentinel events listed. That is listed as one. Not showing up and not being responsive is not listed on that as a sentinel event.

*VIGHHFC et al. v. Wrensford*     2025 VI 12
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 5 of 44

analysis meeting and the comprehensive systematic analysis, it appears that in actuality the meeting covered all aspects of the health care provided to the Patient on May 4, 2023—including but not limited to Dr. Wrensford's failure to immediately return to RLSH to evaluate the Patient when requested by the emergency department staff that afternoon.

¶ 7     On May 15, 2023, Dr. Boschulte—as RLSH Medical Staff President—addressed a letter to Dr. Wrensford in which she advised, *inter alia*, that the RLSH Medical Executive Committee had met and "[they] are formally requesting a meeting as part of a Collegial Intervention" pursuant to the RLSH Medical Staff By-Laws, and that Dr. Wrensford's "attendance at this meeting is mandatory and failure to attend the meeting without a valid excuse showing . . . good cause will lead to automatic suspension of clinical privileges"[7] under the RLSH Medical Staff By-Laws.[8]

¶ 8     On May 22, 2023, Dr. Peterkin and Dr. Bolschulte—as RLSH Medical Executive Committee Members—met with Dr. Wrensford for the collegial intervention meeting. At the beginning of the meeting, Dr. Wrensford inquired about having an administrative person present and having formal minutes taken at the meeting. In response, Dr. Wrensford was advised: (i) no administrative person will be present, (ii) no formal minutes will be taken since it was not required, and (iii) they could record the meeting and produce informal minutes therefrom. Dr. Wrensford, cognizant that the results of a collegial intervention meeting could be placed in her personnel file,

---

[7] The Superior Court and the parties use the following terms interchangeably: "clinical privileges," "hospital privileges," "staff privileges," "medical privileges," "privileges," and variations thereof. For consistency, we will use the term "clinical privileges" unless quoting directly from another source.

[8] The May 15, 2023 letter provided in relevant part:

> This correspondence is in response to a formal request that was made by Dr. Delphine Olivacce, Chief Nursing Officer, for a peer review after an incident that occurred on May 4, 2023. There were two areas of focus that we were asked to evaluate. The first was regarding the placement of a chest tube on the incorrect side of a patient. The second was to address your refusal to respond to the request of providers to have you re-evaluate this patient after expression of serious concerns for the patient's wellbeing.

*VIGHHFC et al. v. Wrensford*
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 6 of 44

2025 VI 12

decided to leave right then, but told them she would return once they had someone there to take formal minutes and make an official record of the meeting.

¶ 9   On June 2, 2023, Dr. Rosenberg—as RLSH Acting Chief Medical Officer—and Dr. Odlum—as RLSH Chief of Surgery—met with Dr. Wrensford to discuss the health care she provided to the Patient on May 4, 2023. Dr. Rosenberg, apparently unaware that a root cause analysis meeting had already occurred, asked Dr. Wrensford to share her perspective about the events of May 4, 2023. In response, Dr. Wrensford suggested that, rather than responding verbally, she could provide them with a written synopsis of what happened along with the Patient's record and chart. Dr. Rosenberg agreed to Dr. Wrensford's suggestion and gave her a deadline of the following mid-week to submit these materials.

¶ 10   On June 8, 2023, Dr. Boschulte—as RLSH Medical Staff President—addressed a letter to Dr. Wrensford in which she outlined the events of the May 22, 2023 collegial intervention meeting and advised Dr. Wrensford that the "administration has expressed concerns regarding care or treatment of patient" and that "[t]here is a question about [Dr. Wrensford's] conduct on the day and there are concerns about [her] ability to work harmoniously with others." Dr. Boschulte further advised Dr. Wrensford that the RLSH Medical Executive Committee had met and decided to initiate a formal investigation, and thus, they needed to appoint a three-member ad hoc investigative committee to conduct the investigation and issue a report afterwards. Dr. Wrensford was asked to appoint one member to the ad hoc investigative committee pursuant to the RLSH Medical Staff By-Laws, and was given a deadline of June 16, 2023 to do so.

¶ 11   In response, on June 16, 2023, Dr. Wrensford addressed a letter to Dr. Boschulte—as RLSH Medical Staff President—in which she advised that she "cannot identify a member of staff who would qualify to review a surgical case" given the restriction that the member "cannot be

*VIGHHFC et al. v. Wrensford*
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 7 of 44

2025 VI 12

[her] partners, associates, relatives, or [her] competitors." Dr. Wrensford further advised that she "also ha[d] concerns about the care that the patient in question received and thus would like to request an outside review of this case to ensure a comprehensive objective analysis."

¶ 12    On the same date, June 16, 2023, Dr. Rosenberg—as RLSH Acting Chief Medical Officer—addressed a letter to Dr. Wrensford in which he advised that because of Dr. Wrensford's failure to provide him with a written response as they agreed, "he was given no choice but to base [his] evaluation of the patient's care and [Dr. Wrensford's] involvement in his care on the accounts provided to [him] by the physicians and nurses who participated in caring for the patient while in the Emergency Room and [his] review of the medical records in this case." Dr. Rosenberg further advised that "[c]onsidering the multiple violations of RLSH policies, including [Dr. Wrensford's] unacceptable patient care, lack of collegiality, and insubordination, [he was] suspending [her] for a period of eight weeks without pay,…effective immediately." It is unclear whether Dr. Rosenberg, when he wrote his June 16, 2023 letter, was aware that RLSH Medical Executive Committee had decided appoint an ad hoc investigative committee to conduct a formal investigation regarding the events of May 4, 2023 and issue a report afterwards.

¶ 13    On June 21, 2023, Dr. Boschulte emailed Dr. Wrensford and acknowledged receipt of her June 16, 2023 letter and responded: "The investigation will not address [Dr. Wrensford's] technical abilities as a surgeon. It specifically will address the situation surrounding [her] response to requests made by staff to return to the emergency room… If [she is] unable to assign a person to the ad hoc investigative committee by Friday, June 23, 2023, then one will be assigned for [her] in order to complete the investigation."

¶ 14    On August 2, 2023, Dr. Wrensford emailed Dr. Boschulte around noon in response to their earlier conversation: "In [the] conversation this morning [Dr. Boschulte] stated that [she] would

*VIGHHFC et al. v. Wrensford*
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 8 of 44

2025 VI 12

proceed with suspending hospital privileges if [Dr. Wrensford] do[es] not name a person to the ad hoc investigative committee by close of business today. [Dr. Wrensford's] written request of June 16 for an external review stands. Specifically for the reasons outlined in said request, and also it is quite apparent that any internal investigation that then must report to the current CMO will not be free of bias."

¶ 15    On August 3, 2023, Dr. Boschulte—as RLSH Medical Staff President—addressed a letter to Dr. Wrensford in which she advised that "[they] are not denying [her] the opportunity to have an external review, but rather insisting that [Dr. Wrensford] follow[s] the bylaws and appoint [her] representative to the Ad Hoc Investigation Committee to initiate the investigation" because "[t]he only way to initiate an external review is through the Investigation Committee." Dr. Boschulte further advised that, due to Dr. Wrensford's failure to appoint a member by the given deadline, Dr. Wrensford's "privileges are voluntarily suspended until [she] can appoint a member to the [ad hoc investigation] Committee" as per the RLSH Medical Staff By-Laws.

¶ 16    On September 14, 2023, Dr. Rosenberg—as RLSH Acting Chief Medical Officer—addressed a letter to Dr. Wrensford in which he pointed out that Dr. Wrensford was supposed to return to work at RLSH on August 7, 2023 given that her suspension of employment ended on August 6, 2023, but Dr. Wrensford was unable to provide services as a general surgeon at RLSH on August 7, 2023 due to the suspension of her clinical privileges. Dr. Rosenberg further pointed out that "[a]s [Dr. Wrensford is] aware, [she] cannot provide services as a general surgeon on the [RLSH] general surgery call schedule unless [she] ha[s] privileges," and asked Dr. Wrensford to "provide the hospital with [her] first date of availability to be [able to] provide services as a general surgeon."

*VIGHHFC et al. v. Wrensford*            2025 VI 12
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 9 of 44

¶ 17    On October 2, 2023, Dr. Rosenberg—as RLSH Acting Chief Medical Officer—addressed a letter to Dr. Wrensford in which he pointed out that "the hospital has received no communication from [her]" in response to his September 14, 2023 letter and advised that "[i]f [Dr. Wrensford] do[es] not provide a response with two (2) working days of receipt of this letter, [she] will be relieved of [her] duties at [RLSH] in accordance with the Administrative Rules and Regulations."

¶ 18    On November 10, 2023, Dr. Wrensford filed a verified complaint against the Hospital Party in connection with the suspension of her clinical privileges. Her complaint alleged the following causes of action: Count I-"Violation of Virgin Islands Law – T3 VIC Chapter 25 Personnel Merit System"; Count II-"Violation of Virgin Islands Law – T19 VIC 246"; Count III-"Violation of 14th Amendment Constitutional Due Process"; Count IV-"Negligence-Breach of Duty"; Count V-"Gross Negligence"; Count VI-"Defamation"; and Count VII-"Tortious Interference With Contract." Dr. Wrensford sought money damages and injunctive relief against the Hospital Party.

¶ 19    On the same date, November 10, 2023, Dr. Wrensford also filed an emergency motion for a temporary restraining order in which she sought the following relief by asking the court to issue an order: "1. Ordering Defendant to reinstate Plaintiff's Hospital privileges. 2. Enjoining Defendant from withholding Plaintiff's on-call work assignments. 3. Ordering Defendant to place Plaintiff on the on-call schedule to perform her job. 4. Ordering Defendant to put Plaintiff back on the payroll and pay her wages and salary and enjoining Defendant from further withholding Plaintiffs salary and wages. 5. Ordering Defendant to pay Plaintiff sick leave benefits and enjoining Defendant from further withholding Plaintiffs employee sick leave benefits of which she is entitled. 6. Enjoining Defendant from further engaging in biased, unfair, retaliatory, and unreasonable processes and pretextual 'investigations' that unfairly punish, harass and place Plaintiff's profession in jeopardy twice to stop her from working as a surgeon in the Territory."

*VIGHHFC et al. v. Wrensford*
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 10 of 44

2025 VI 12

¶ 20 On November 14, 2023, before the Hospital Party was served with process,[9] Attorney Commissiong—as RLSH Chief Executive Officer—addressed a letter to Dr. Wrensford in which she advised, *inter alia*, that "[RLSH] has scheduled [her] to resume work on the general surgery call rotation schedule…from Monday, November 20, 2023 at 8am through Monday, November 27, at 7:59am" and that Dr. Wrensford is "required to have active medical staff privileges in order to practice medicine as a general surgeon at [RLSH] [and she] must have active medical staff privileges before [her] call coverage starts at 8am on Monday, November 20, 2023, as that is a requirement for practicing medicine as general surgeon at [RLSH]." Attorney Commissiong requested Dr. Wrensford to "provide . . . [RLSH] Medical Staff Office with documentation that [she] ha[s] the medical staff privileges required to practice medicine as a general surgeon at [RLSH] on or before [her] call coverage starts at 8am on Monday, November 20, 2023" and further advised Dr. Wrensford that if she is "unable to return to work to provide patient care services at [RLSH] as the general surgeon on call as required and scheduled, [Dr. Wrensford's] employment with [RLSH] will be terminated."

¶ 21 On November 15, 2023, Dr. Wrensford filed an amended[10] emergency motion for a temporary restraining order (together with the initial emergency motion, "Emergency Injunction Motion") in response to Attorney Commissiong's November 14, 2023 letter. In the latter emergency motion, Dr. Wrensford argued, *inter alia*, that the Hospital Party is "continually denying [her]…property interest in the privileges, compensation and benefits of employment"

---

[9] Nevertheless, the Hospital Party may have been on notice of Dr. Wrensford's lawsuit and her emergency motion for temporary restraining order since Dr. Wrensford indicated in her November 15, 2024 amended emergency motion that she "emailed [the Hospital Party] the V.I. R. 65(B) [sic] notice of th[e] emergency court action" on November 14, 2024.

[10] While titled as an amended emergency motion for temporary restraining order, the document actually supplements rather than amends the initial emergency motion.

*VIGHHFC et al. v. Wrensford*    2025 VI 12
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 11 of 44

without due process in violation of the Fourteenth Amendment. In addition to the relief sought in her initial emergency motion, Dr. Wrensford further "pray[ed] that this court…restrain Defendant [VIGHHFC], its employees, officers and associates from . . . carrying out its threats to terminate Plaintiff's employment by November 20, 2023, in connection with its November 14, 2023 letter to Plaintiff and any other emergency relief that is just and proper."

¶ 22    On November 17, 2023, Dr. Boschulte—as RLSH President of the Medical Staff—addressed a letter to Dr. Wrensford in which she advised that Dr. Wrensford's "failure to appoint a member to the Ad Hoc Investigating [sic] Committee leading to [Dr. Wrensford's] suspension for more than 90 days has resulted in automatic resignation from the Medical Staff" and referenced Article VI, Part D, Section 2D of the RLSH Medical Staff By-Laws.

¶ 23    On the same date, November 17, 2023, the Superior Court entered a temporary restraining order granting in part Dr. Wrensford's Emergency Injunction Motion and enjoined the Hospital Party from terminating Dr. Wrensford's employment. The court explained that after reviewing Dr. Wrensford's "Emergency [Injunction] Motion [], the pleadings, declarations and other papers filed in support thereof," it found that Dr. Wrensford "has a reasonable probability of success on the merits, . . . will suffer immediate, irreparable harm if Defendants terminate Dr. Wrensford's employment; and [that] the injury to plaintiff, if relief is not granted, outweighs injury to the interests of the Defendants."

¶ 24    On December 5, 2023, the parties appeared before the Superior Court for a preliminary injunction hearing. After hearing arguments and testimony over the next two days, the court took the matter under advisement.

¶ 25    On March 1, 2024, the Superior Court entered a memorandum opinion in which it made a finding of the preliminary injunction factors and, upon "weigh[ing] the four factors using a

*VIGHHFC et al. v. Wrensford*
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 12 of 44

2025 VI 12

variation of the sliding scale method," found that Dr. Wrensford was entitled to injunctive relief. In the accompanying order, the Superior Court granted a preliminary injunction in favor of Dr. Wrensford which enjoined the Hospital Party "from terminating Plaintiff Glenda Wrensford pending completion of the formal investigation and ultimate Board action," enjoined the Hospital Party "from sending a negative report to the Joint Commission, pending completion of the formal investigation," ordered the Hospital Party to "place Wrensford back on the payroll and reinstate all other benefits associated with employment within twenty (20) days of entry of this Order," ordered that the Hospital Party had "the discretion to not reinstate Wrensford's clinical privileges until the formal investigation is completed, but in the interim, shall place and maintain Wrensford on the payroll pending the completion of the investigation," and ordered that the Hospital Party had "the right to again initiate a formal investigation, provided they do so within sixty (60) days of entry of this Order, failing which they will be deemed to have waived the formal investigation."

¶ 26    Thereafter, the Hospital Party filed a timely notice of appeal from the Superior Court's March 1, 2024 Order.[11] V.I. R. App. P. 5(a)(1) ("In a civil case in which an appeal is permitted by law as of right from the Superior Court to the Supreme Court, the notice of appeal required by Rule 4 shall be filed with the Clerk of the Supreme Court within 30 days after the date of entry of the judgment or order appealed from; but if the Government of the Virgin Islands or the United States of America or an officer or agency thereof is a party, the notice of appeal may be filed by any party within 60 days after such entry."). Thereafter, Dr. Wrensford filed a timely notice of cross appeal.[12] V.I. R. App. P. 5(a)(3) ("If one party timely files a notice of appeal, any other party

---

[11] The Hospital Party filed its notice of appeal on April 2, 2024. Since VIGHHFC "is a body corporate and politic constituting a public benefit corporation of the Government of the Virgin Islands," 19 V.I.C. § 243(a), it is entitled to the 60-day period in which to file a notice of appeal, as afforded by V.I. R. App. P. 5(a)(1).

[12] Dr. Wrensford filed her notice of cross appeal on April 16, 2024.

*VIGHHFC et al. v. Wrensford*                    2025 VI 12
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 13 of 44

may file a notice of appeal within 14 days after the date on which the first notice of appeal was filed, or within the time otherwise prescribed by statute or by this Rule, whichever period last expires.").

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

¶ 27   This Court has appellate jurisdiction over "all appeals from the decisions of the courts of the Virgin Islands established by local law." 48 U.S.C. § 1613a(d). The Virgin Islands Code vests this Court with jurisdiction over appeals from "[i]nterlocutory orders of the Superior Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions," 4 V.I.C. § 33(b)(1), and we may review such injunction order "even as the underlying action remains pending in the Superior Court," *3RC & Co. v. Boynes Trucking Sys.*, 63 V.I. 544, 549 (V.I. 2015). Because the Hospital Party and Dr. Wrensford timely filed their respective notice of appeal and notice of cross appeal, we have jurisdiction over the appeal and cross-appeal from the Superior Court's March 1, 2024 order granting a preliminary injunction in favor of Dr. Wrensford.

¶ 28   This Court reviews the Superior Court's overall decision to grant or deny a motion for preliminary injunction for abuse of discretion. *Gourmet Gallery Crown Bay, Inc. v. Crown Bay Marina, L.P.*, 68 V.I. 584, 592 (V.I. 2018). "An abuse of discretion arises only when the decision rests upon a clearly erroneous finding a fact, an errant conclusion of law or an improper application of law to fact." *Streibich v. Underwood*, 74 V.I. 488, 499 (V.I. 2021) (citations omitted). Moreover, "we review the Superior Court's factual findings of each injunction factor for clear error, and we exercise plenary review of its conclusions of law." *Sam's Food Distribs., Inc. v. NNA&O, LLC*, 73 V.I. 453, 460 (2020) (citing *Yusuf v. Hamed*, 59 V.I. 841, 848 (V.I. 2013) (explaining that "we

*VIGHHFC et al. v. Wrensford*
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 14 of 44

2025 VI 12

review the Superior Court's factual findings regarding likelihood of irreparable harm, harm to the nonmoving party, and whether the injunction is in the public interest only for clear error"). "Because clear error is a very deferential standard, this Court will 'only reverse a factual determination as being clearly erroneous if it is completely devoid of minimum evidentiary support or bears no rational relationship to the supportive evidentiary data.'" *Id.* (quoting *In re Estate of Small*, 57 V.I. 416, 428 (V.I. 2012)). Thus, we will not overturn the Superior Court's factual determination "so long as 'a rational person could agree with the assessment of the Superior Court." *Gourmet Gallery Crown Bay, Inc.*, 68 V.I. at 592 (quoting *Moore v. Walters*, 61 V.I. 502, 508 (V.I. 2014) (alterations omitted).

## B. Overview of Issues

¶ 29 On appeal,[13] the Hospital Party argues that the Superior Court "abused its discretion in issuing its March 1, 2024 Order granting the injunction" because the court erred in its analysis of the preliminary injunction factors. First, the Hospital Party asserts that the Superior Court "erred in concluding that Appellee demonstrated a likelihood of success on the merits of her claim for violation of due process in the termination of her employment." Second, the Hospital Party claims that the Superior Court "erred insofar as it assumed, without discussion or explanation, that Appellee would suffer irreparable harm if she was not immediately placed back on the payroll,

---

[13] In its appellant's brief, the Hospital Party listed the following "statement of the issues":

> 1. Whether the Superior Court abused its discretion in entering an injunction prohibiting the Hospital from terminating Appellee's employment.
>
> 2. Whether the Superior Court abused its discretion in entering an injunction prohibiting the Hospital from sending a negative report to the Joint Commission.
>
> 3. Whether the Superior Court abused its discretion in entering an injunction requiring the Hospital to reinstate Appellee to the payroll.
>
> 4. Whether the Superior Court abused its discretion in entering an injunction requiring the Hospital to initiate a formal investigation in sixty days or waive the right to conduct such an investigation.

*VIGHHFC et al. v. Wrensford*      2025 VI 12
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 15 of 44

and therefore the court abused its discretion by enjoining the Hospital to reinstate her to the payroll." Third, the Hospital Party avers that the Superior Court erred in assessing the balance of harms between the parties because "Appellee would lose nothing by the delay—as she would still receive a paycheck pursuant to that provision of the injunction—while the Hospital [Party], in the event of waiver under the terms of the injunction, would be greatly compromised in its ability to ensure safe, competent treatment of its patients." Lastly, the Hospital Party contends that the Superior Court "erred in determining that Appellee had demonstrated either a likelihood of success on the merits or irreparable harm and, therefore, this observation cannot support a finding that the public interest favors issuance of the injunction."

¶ 30    The Hospital Party also argues that the Superior Court erred in determining the scope of the injunction in the following ways: ordering the reinstatement of Dr. Wrensford to the payroll; enjoining the Hospital Party from reporting Dr. Wrensford's clinical privilege suspension; and ordering the Hospital Party to initiate a formal investigation in sixty days or waive its right thereto.

¶ 31    Based on these contentions, the Hospital Party concludes that the Superior Court's March 1, 2024 order should be reversed, the preliminary injunction should be vacated, and this matter should be remanded for further proceedings.

¶ 32    In her appellee's brief, Dr. Wrensford argues that "the Superior Court did not abuse its discretion when it granted the preliminary injunction based on Appellee's satisfaction of all four injunction factors" but "the scope of the injunction . . . needed to be narrowly tailored to restrain the wrongful conduct." In her cross appeal[14] therein, she argues that the Superior Court erred in

---

[14] In her appellee's brief, the Hospital Party listed the following "statement of the issues":

> 1. Whether the Court erred when it failed to order the immediate restoration of Appellee's wrongfully suspended privileges and related relief having correctly ruled that Dr. Wrensford satisfied all four injunction factors legally entitling her to the injunctive relief she sought, as a matter of law.

*VIGHHFC et al. v. Wrensford*
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 16 of 44

2025 VI 12

determining the scope of the injunction in the following ways: when the court "(1) ordered that Defendants 'have the right to initiate a formal investigation' (2) linked the order enjoining termination to the 'completion of the formal investigation;' (3) granted Defendants the discretion to not reinstate Wrensford's clinical privileges until the formal investigation is completed; (4) did not immediately order the injunctive relief sought; (5) did not order immediate restoration of Dr. Wrensford's privileges and her [immediate placement] on the on-call schedule."

¶ 33    In her briefing Dr. Wrensford concludes that "the scope of the injunction should [] be narrowly tailored to restrain the wrongful conduct" since "[a]ll of the orders that relate to the formal investigation are much too broad" and "[a]ll that is necessary to restrain the unlawful conduct is to immediately grant Wrensford the injunctive relief sought, full restoration of her privileges and [her immediate placement on the] on-call schedule."

¶ 34    In its reply brief, the Hospital Party reiterates its position that the Superior Court's March 1, 2024 order should be reversed, the preliminary injunction should be vacated, and this matter should be remanded for further proceedings. In response to Dr. Wrensford's cross appeal, the Hospital Party argues that the Superior Court "did not err in denying Appellee's request for an injunction immediately restoring her clinical privileges."

¶ 35    In her reply brief, Dr. Wrensford reiterates her position that the Superior Court "erred when it failed to immediately order reinstatement of the privileges [and] reinstatement to the on the call schedule[ ] consistent with the Memorandum Opinion but instead ordered the initiation of

---

2. Whether or not the Superior Court erred when it granted Appellants "the discretion" to decide to "not reinstate Dr. Wrensford's clinical privileges until the formal investigation is completed" despite having correctly ruled that she is lawfully "entitled to have her clinical privileges immediately restored."

*VIGHHFC et al. v. Wrensford*
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 17 of 44

2025 VI 12

an investigation and withheld Appellee's privileges pending completion of an investigation that was not supported or justified in the record pursuant to Rule 65(d)."

## C. Preliminary Injunction Analysis

¶ 36    "[T]he main purpose of a preliminary injunction is to maintain the status quo, defined as the last, peaceable, non-contested status of the parties." *Gallery Crown Bay,* 68 V.I. at 601 (internal quotation marks and citation omitted); *see Yusuf,* 62 V.I. at 569 n.3 (noting that the "clear purpose of that preliminary injunction was to maintain the status quo until the Superior Court was able to consider [the] claims on the merits"). In other words, a preliminary injunction is a temporary form of relief that preserves the status quo between the parties until the court decides on the merits of the case.

¶ 37    When determining whether to grant or deny a motion for preliminary injunction, the Superior Court must consider the following factors: "(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary injunction relief will result in even greater harm to the nonmoving party; and, (4) whether granting the preliminary relief will be in the public interest." *Gourmet Gallery Crown Bay, Inc.,* 68 V.I. at 596-97 (quoting *3RC & Co.,* 63 V.I. at 550). "To prevail on a motion for preliminary injunction, the moving party bears the burden of 'making some showing on all four injunction factors,' which the Superior Court must evaluate 'under a sliding-scale standard.'" *Id.* at 584 (quoting *3RC & Co.,* 63 V.I. at 557)).

¶ 38    "In conducting this sliding-scale analysis, the Superior Court must make findings on each of the four factors and determine whether — when the factors are considered together and weighed against one another — the moving party has made 'a clear showing that [it] is entitled to [injunctive] relief.'" *3RC & Co.,* 63 V.I. at 557 (quoting *Yusuf,* 59 V.I. at 847). For a preliminary

*VIGHHFC et al. v. Wrensford*                           2025 VI 12
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 18 of 44

injunction, a strong showing of irreparable damage may compensate for a weak showing of the

likelihood of success on the merits, and conversely, a strong showing of the likelihood of success

on the merits may compensate for a weak showing of irreparable harm." *Id.* at 555-56.[15] "An

extraordinary and drastic remedy," a preliminary injunction is "never awarded as of right" but only

---

[15] In *3RC & Co.*, this Court explained:

> Because "[a] court of equity has traditionally had the power to fashion any remedy deemed necessary and appropriate to do justice in [a] particular case," a court has a great deal more flexibility in considering equitable remedies than it does in considering legal remedies. *Kalloo v. Estate of Small*, 62 V.I. 571, 584 (V.I. 2015) (quoting *United States v. Price*, 688 F.2d 204, 211 (3d Cir. 1982)).
>
> . . . .
>
> This is why a party seeking injunctive relief must demonstrate that the injunction is necessary to avoid "certain and imminent harm for which a monetary award does not adequately compensate" — in other words, harm without an adequate legal remedy. *Yusuf*, 59 V.I. at 854 (internal quotation marks and citation omitted).
>
> . . . .
>
> But "[i]rreparable injury [alone] is not enough to support equitable relief. There also must be a plausible claim on the merits." *Marco St. Croix, Inc.*, 62 V.I. 586, 590 n.2 (V.I. 2015) (quoting *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)).
>
> . . . .
>
> So in addition to showing that it is likely to suffer irreparable harm without an injunction, the moving party must also make "at least *some* showing that [it] is likely to succeed on the merits" in moving for a preliminary injunction. *Marco St. Croix, Inc.* 63 V.I. at 590 n.2 (emphasis in original). Accordingly, "[t]he issuance or denial of a preliminary injunction requires an evaluation in combination of the moving party's claim of injury and its chance of success on the merits."
>
> . . . .
>
> As a result, in some cases, the showing on the merits may be as minimal as simply making out a prima facie case if the showing on the moving party's likelihood of irreparable harm is strong enough — and the likelihood that the injunction would cause irreparable harm to the nonmoving party is low enough — to outweigh the weaker showing on the merits.
>
> . . . .
>
> On the other hand, "[a]lthough the primary reason for granting a preliminary injunction is to prevent irreparable harm, this factor is less decisive where the likelihood of success on the merits is very strong." *District of Columbia v. Greene*, 806 A.2d 216, 223 (D.C. 2002) (citing *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)). Where the moving party makes out a very strong showing on the merits — for example a clear and convincing one — injunctive relief may still be appropriate even where the moving party's showing of "certain and imminent harm for which a monetary award does not adequately compensate" is much weaker, so long as the nonmoving party's likelihood of irreparable harm is similarly very low. *Yusuf*, 59 V.I. at 854; *see also Allen v. Prime Computer, Inc.*, 540 A.2d 417, 421 (Del. 1988) ("[A] strong showing of [probable] success on the merits may compensate for a weak showing of irreparable harm.").

63 V.I. at 553-557.

*VIGHHFC et al. v. Wrensford*                    2025 VI 12
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 19 of 44

"upon a clear showing that the plaintiff is entitled to such relief." *Gourmet Gallery Crown Bay,*

*Inc.*, 68 V.I. at 596 (quoting *Yusuf*, 59 V.I. at 847).

¶ 39    In its March 1, 2024 order, the Superior Court granted injunctive relief pertaining to Dr.

Wrensford's employment termination, Dr. Wrensford's clinical privileges suspension (including

the reporting thereof), Dr. Wrensford's payroll reinstatement, and Dr. Wrensford's sick leave

benefits reinstatement.[16] This Court will evaluate each factor in turn, and if necessary, address the

scope of the injunction.

    *1.  Reasonable probability of success on the merits*

¶ 40    In addressing the first factor, the Superior Court found that Dr. Wrensford has a property

interest in her employment and clinical privileges and that Dr. Wrensford was not given "adequate

notice or hearing" prior to her clinical privileges suspension and her employment termination. On

---

[16] For convenience and clarity, the Superior Court's March 1, 2024 order is reproduced in its entirety below:

    IN ACCORDANCE with the memorandum opinion entered on this day, Opinion Number 2024 VI Super 12 it is hereby

    ORDERED that Plaintiff's Motion for Preliminary Injunction is GRANTED; it is further

    ORDERED that Defendants are enjoined from terminating Plaintiff Glenda Wrensford, pending completion of the formal investigation and ultimate Board action, if any; it is further

    ORDERED that Defendants are enjoined from sending a negative report to the Joint Commission, pending completion of the formal investigation; it is further

    ORDERED that Defendants shall place Wrensford back on the payroll and reinstate all other benefits associated with employment within twenty 1201 days of entry of this Order; it is further

    ORDERED that Defendants have the discretion to not reinstate Wrensford's clinical privileges until the formal investigation is completed, but in the interim, Defendants shall place and maintain Wrensford on the payroll pending the completion of the investigation; it is further

    ORDERED that Defendants have the right to again initiate a formal investigation, provided they do so within sixty (60) days of entry of this Order, failing which they will be deemed to have waived the formal investigation; and it is further

    ORDERED that the copies of this Order shall be distributed to Denise N. George, Esq. and Assistant Attorney General Royette V. Russell, Esq.

*VIGHHFC et al. v. Wrensford*                    2025 VI 12
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 20 of 44

these issues, the Superior Court held that Dr. Wrensford "has demonstrated a reasonable

probability of success on the merits of her denial of due process claim."[17]

¶ 41    In order to show a reasonable probability of success on the merits, the party seeking a

preliminary injunction "d[oes] not need to show that he will actually prevail on the merits at trial,

---

[17] While Dr. Wrensford alleged seven separate counts in her complaint, the crux of the dispute pertaining to her request for injunctive relief is whether the Hospital Party unlawfully suspended her clinical privileges and terminated her employment in violation of due process. In her Emergency Injunction Motion, Dr. Wrensford focused her analysis on alleged due process violations while tangentially addressing violations of other Virgin Islands law in connection therewith—to wit, in her initial emergency motion, she argued: "Defendant's denial of privileges are unreasonably, arbitrarily and capriciously placed on Plaintiff in total disregard of her due process protections of liberty and property"; in her latter emergency motion, she argued: "Because Defendant is a public hospital corporation of the Virgin Islands due process is required and it cannot lawfully continue violate Plaintiff's constitutional due process causing further danger of irreparable harm. Defendant cannot lawfully deprive Plaintiff or any person of life, liberty, or property, without due process of law pursuant to the 14ᵗʰ Amendment" and asked the court to "restrain Defendant VIGHHFC, its employees, officers and associates from pursuing carrying out its threats to terminate Plaintiff's employment by November 20, 2023."

Thus, it was logical that the Superior Court focused its analysis of the first injunction factor on the likelihood of success on the merits of Dr. Wrensford's due process claim as to the suspension of her clinical privileges to the termination of her employment. In fact, the Superior Court, upon balancing and finding that the factors weighed in favor of preliminary injunction, granted injunctive relief pertaining to Dr. Wrensford's employment and clinical privilege. However, Dr. Wrensford's complaint does not contain any allegations regarding the termination of her employment since the termination occurred after she filed the complaint. In other words, an unpled issue—Dr. Wrensford's employment termination—was raised in her latter emergency motion and addressed by the Superior Court.

This Court notes that Dr. Wrensford filed a motion for leave to file a first amended complaint and an amended motion thereof on September 17, 2024 and September 18, 2024, respectively. *See Cianci v. Chaput*, 64 V.I. 682, 690 n.2 (V.I. 2016) (recognizing that courts may take judicial notice of other courts' dockets and papers); *cf. King v. Appleton*, 61 V.I. 339, 348 (V.I. 2014) ("[T]he Superior Court may take judicial notice of the existence of a document that has been filed with it in another proceeding." (quotation marks and citation omitted)). In the attached proposed first amended complaint, Dr. Wrensford pled facts related to her employment termination. However, it is unclear whether the Superior Court has granted Dr. Wrensford's motions and permitted a first amended complaint to be filed.

Nevertheless, this Court must point out that a supplemental pleading rather than an amended pleading is used to add relevant matters that occurred after the commencement of the action. *See* V.I. R. CIV. P. Rule 15(d) ("On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened **after the date of the pleading to be supplemented**.") (emphasis added). "Rule 15(d) permits claims which arise after the initial pleadings are filed to be added because the goal of the rule is to promote as complete an adjudication of the dispute between the parties as possible." *Martinez v. Hess Oil Virgin Islands Corporation*, 69 V.I. 519, 545 (V.I. Super. Ct. 2018) (citing *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1057 (9th Cir. 1981)). This supplementation would conform the pleadings to the evidence. *Cf.* V.I. R. CIV. P. 15(b)(2) ("When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move -- at any time, even after judgment -- to amend the pleadings to conform them to the evidence and to raise an unpled issue. But failure to amend does not affect the result of the trial of that issue.").

*VIGHHFC et al. v. Wrensford*  2025 VI 12
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 21 of 44

or that his success is 'more likely than not,' only that he has 'a reasonable chance, or probability, of winning.'" *Yusuf*, 59 V.I. at 849.

¶ 42    The Fifth and Fourteenth Amendments guarantee that no person shall be deprived of "life, liberty, or property, without due process of law," U.S. CONST. amends. V, XIV, and these Amendments "are made applicable to the Virgin Islands pursuant to the last paragraph of the Virgin Islands Bill of Rights." *Balboni v. Ranger Am. of the V.I., Inc.*, 70 V.I. 1048, 1055 (V.I. 2019). A procedural due process claim[18] turns on two questions: "the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (internal citations omitted). "The types of interests that constitute 'liberty' and 'property' for Fourteenth Amendment purposes are not unlimited;" the interest must rise to more than "an abstract need or desire," *Board of Regents of State Colleges v. Roth*, 408 U.S. at 577, and must be based on more than "a unilateral hope," *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 465 (1981). "Rather, an individual claiming a protected interest must have a legitimate claim of entitlement to it." *Ky. Dep't of Corr.*, 490 U.S. at 460.

¶ 43    An essential principle of procedural due process is that a deprivation of life, liberty, or property "be preceded by notice and opportunity for hearing appropriate to the nature of the

---

[18] Due process claims come in two varieties—procedural and substantive. *See generally United States v. Salerno*, 481 U.S. 739, 746 (1987) (distinguishing the two concepts) (citations omitted). While Dr. Wrensford did not specify the type of her due process claim in the complaint, the parties and the Superior Court correctly treated the alleged violation as coming within the ambit of procedural due process. Thus, this Court's discussion herein is limited to procedural due process.

*VIGHHFC et al. v. Wrensford*       2025 VI 12
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 22 of 44

case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). Procedural due process requires "some kind of a hearing" prior to the discharge of an employee who has a constitutionally protected property interest in his employment. *Board of Regents*, 408 U.S. at 569-570. The United States Supreme Court pointed out that "the truism that [procedural] [d]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances," but "is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (internal quotation marks and citations omitted).

¶ 44    We now turn to the first question pertinent to the procedural due process claim: whether there exists a liberty or property interest which has been interfered with by the State. *Ky. Dep't of Corr.*, 490 U.S. at 460. Here, the Hospital Party does not argue—nor can it seriously be contended—that there is no government action here since VIGHHFC, "a public entity of the government of the Virgin Islands," 19 V.I.C. § 245(a), is inextricably part of the Government of the Virgin Islands. Furthermore, the parties do not dispute that, prior to the termination of her employment, Dr. Wrensford was a "classified" and "regular" employee of VIGHHFC.[19] Moreover, on July 6, 2022, Dr. Wrensford's RLSH reappointment application was approved for the period of

_____

[19] In her complaint, Dr. Wrensford alleged: "Dr. Wrensford has been employed with VIGHHFC at the RLSH providing such services for over ten years. As such, Plaintiff is a full-time government employee and paid a fixed annual salary with all the employment benefits and responsibilities of a government employment as required by law." In its answer thereto, the Hospital Party admitted this allegation. *See Cianci*, 64 V.I. at 690 n.2 (recognizing that courts may take judicial notice of other courts' dockets and papers); *cf. King*, 61 V.I. at 348.

Dr. Wrensford's government employee status was further supported by the parties' respective briefs in this appeal. In its appellant's brief, the Hospital Party stated: "Appellee, Glenda Wrensford, is a board-certified surgeon and classified employee of the Roy Lester Schneider Regional Medical Center." In her appellee's brief, Dr. Wrensford stated that "[f]or over ten Years, Appellee Dr. Glenda Wrensford, a 20 year board certified surgeon, has been employed by the VIGHHFC as a general surgeon and a 'classified' and 'regular' full time government employee."

*VIGHHFC et al. v. Wrensford*　　　　　　　　2025 VI 12
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 23 of 44

August 6, 2022 through August 5, 2025. Thus, Dr. Wrensford has a property interest—not just an abstract claim—in her employment with VIGHHFC to work at RLSH.

¶ 45　　Additionally, given that Dr. Wrensford's clinical privileges are intricately connected to her employment (since Dr. Wrensford cannot provide services as a general surgeon at RLSH without clinical privileges),[20] Dr. Wrensford similarly has a property interest—not just an abstract claim— in her clinical privileges. Thus, in the present context Dr. Wrensford was entitled to due process protection prior to VIGHHFC's termination of her employment and suspension of her clinical privileges. *See Cleveland Bd. of Educ.*, 470 U.S. at 546 (Procedural due process entitles a public employee with a property right in his employment to notice of the charges against the employee, an explanation of the employer's evidence, and an opportunity to present his side of the story.).

¶ 46　　We now turn to the second question pertinent to the procedural due process claim: whether the procedures attendant upon that deprivation were constitutionally sufficient. *Ky. Dep't of Corr.*, 490 U.S. at 460 . Here, a review of the record reveals that the Superior Court's determination that the termination of Dr. Wrensford's employment and the suspension of Dr. Wrensford's clinical privileges were not preceded by sufficient notice and opportunity for hearing appropriate to the nature of the case has evidentiary support and a rational relationship to the supportive evidentiary data.[21] *See Sam's Food Distribs., Inc.*, 73 V.I. at 460 (explaining that "clear error is a very

---

[20] RLSH Acting Chief Medical Officer Dr. Rosenberg stated in his September 14, 2023 letter to Dr. Wrensford: "As you are aware, you cannot provide services as a general surgeon on the [RLSH] general surgery call schedule unless you have privileges." Additionally, RLSH Chief Executive Officer Attorney Commissiong similarly stated in her November 14, 2023 letter to Dr. Wrensford: "As you know, you are required to have active medical staff privileges in order to practice medicine as a general surgeon at [RLSH]."

Furthermore, Dr. Wrensford alleged in her complaint: "Hospital Privileges are required to perform Plaintiff's job duties of providing medical and surgical services to patients in the Hospital, including surgery, medical procedures, and consultations. Hospital privileges are required for every physician, in public or private practice, to see patients in the Hospital." In its answer thereto, the Hospital Party admitted to this allegation. *See Cianci*, 64 V.I. at 690 n.2 (recognizing that courts may take judicial notice of other courts' dockets and papers); *cf. King*, 61 V.I. at 348.

[21] The Superior Court stated in the March 1, 2024 memorandum opinion:

*VIGHHFC et al. v. Wrensford*
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 24 of 44

2025 VI 12

deferential standard"). Accordingly, the Superior Court did not err in holding that Dr. Wrensford

has shown a reasonable probability of success on the merits of her procedural due process claim.

---

¶ 54    The court agrees that Wrensford received several notices requesting she appoint someone to the ad hoc investigative committee. But Boschulte failed to communicate to Wrensford that her privileges would be suspended as a consequence of failing to assign someone to the investigative committee. In fact, Boschulte communicated in writing to Wrensford on June 21, 2023, that her failure to appoint someone to the investigatory committee would result in Boschulte appointing someone on her behalf. In response, Wrensford stated she was unsuccessful in finding someone to qualify in reviewing her case. Boschulte never appointed a person for Wrensford and testified that she subsequently determined she had no authority, under the Medical Staff Bylaws, to appoint someone to the committee on Wrensford's behalf. Boschulte first informed Wrensford in a phone call conversation on August 2, 2023, that her hospital privileges would be suspended if Wrensford did not name someone to the ad hoc investigative committee The following day, Wrensford's hospital privileges were "voluntarily suspended." However, the court is not persuaded that one phone call rises to the level of adequate notice under the Due Process Clause, particularly because it was provided only one day before Wrensford's clinical privileges were suspended. Furthermore, even if the notice was sufficient, the president of the medical staff had no authority to terminate Wrensford's clinical privileges.

¶ 55    The court finds that Boschulte was correct in determining that the ability to initiate an outside formal investigation was dependent upon the formation of the ad hoc committee. However, the bylaws only state that the ad hoc committee *should* consist of three persons. In other words, the bylaws do not require a committee of three people. Once Wrensford declined to participate, the committee had the right to proceed and refer the matter for an outside investigation, if it so desired. There is no doubt that Wrensford's predicament is partially self-inflicted by failing to accept a phone recording at the attempted collegial intervention meeting on May 22, 2023, demanding formality, and then refusing to participate in a formal investigation under the Medical Staff bylaws to which she is bound. Nonetheless, nothing within the bylaws authorized the President of the Medical Staff to voluntarily suspend Wrensford's hospital privileges without Board approval.

¶ 56    Moreover, the court received no evidence that Wrensford received any notice prior to November 17, 2023, that she was going to be deemed to have automatically resigned her Medical Staff appointment for not appointing a member to the investigative committee.

¶ 57    Separately the court notes that Wrensford had notice and an opportunity but refused to participate in the Collegial Intervention because no administrative person would be present to take formal minutes. But refusal to participate in a Collegial Intervention under the Medical Staff Bylaws only permits the MEC to initiate a formal investigation, not to suspend her hospital privileges. The court finds it understandable that Wrensford never provided a written report to Rosenberg because Boschulte's June 8, 2023, letter to Wrensford stated that after consultation with Rosenberg, a formal investigation was being initiated. Certainly, this led Wrensford to believe that Rosenberg was aware of the formal investigation. Why Rosenberg would still expect a report from Wrensford is unknown. But the court hastens to add that the parallel tracks of sanctions associated with employment and sanctions associated with clinical privileges can certainly be confusing for a member of the medical staff with clinical privileges, especially since clinical privileges are interwoven with employment, and Wrensford could not work without both.

¶ 58    In addition, Boschulte suspended Wrensford's clinical privileges without first making a recommendation to the Board as required by the Board of Director Bylaws. The MEC's course of action did not provide Wrensford with adequate notice or hearing before revoking her privileges and Medical Staff appointment. Depriving Wrensford of her property interest in clinical privileges without proper notice and hearing violates the due process clause. In doing so, the Court finds that Wrensford has demonstrated a reasonable probability of success on the merits of her denial of due process claim.

(Footnotes omitted).

*VIGHHFC et al. v. Wrensford*        2025 VI 12
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 25 of 44

### 2. *Likelihood of irreparable harm to the moving party*

¶ 47    In addressing the second injunction factor, the Superior Court found that Dr. Wrensford's "inability to engage in her profession in the Virgin Islands and the potential loss of her reputation, without a proper basis for suspension of clinical privileges, are not compensable by monetary damages." For this reason, the Superior Court held that Dr. Wrensford "has successfully demonstrated a risk of irreparable harm for which a monetary award would be inadequate" if the injunctive relief requested was denied.

¶ 48    Irreparable harm is "certain and imminent harm for which a monetary award does not adequately compensate." *Yusuf*, 59 V.I. at 854 (citation omitted). A moving party will satisfy this test if it can demonstrate that its monetary damages are either "difficult to ascertain or are inadequate." *Gallery Crown Bay, Inc.*, 68 V.I. at 597 (quoting *Yusuf*, 59 V.I. at 854 (citations omitted)). Conversely, a moving party fails to establish irreparable injury for preliminary injunction purposes if "the record indicates that [a plaintiff's loss] is a matter of simple mathematic calculation." *Id.* (quoting *Yusuf*, 59 V.I. at 854 (citations omitted)).

¶ 49    Here, a review of the records reveals that the Superior Court's determination that Dr. Wrensford would be irreparably injured—to wit: she would suffer reputational damage, she would be unable to continue to practice in the Virgin Islands, she would be limited in her ability to find employment outside of the Virgin Islands, and she would be forced to relocate off-island—by the denial of the injunctive relief pertaining to her employment and clinical privileges has evidentiary support and a rational relationship to the supportive evidentiary data.[22] *See Sam's Food Distribs.*,

---

[22] The Superior Court stated in the March 1, 2024 memorandum opinion:

> ¶ 62    RLSH is the only hospital located on St. Thomas. If the court denies the motion for preliminary injunction, Wrensford will be unable to practice her profession in the Virgin Islands. And the intangible cost of a non-voluntary move off island cannot be calculated. Further, any effort by Wrensford to relocate and

*VIGHHFC et al. v. Wrensford*
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 26 of 44

2025 VI 12

*Inc.*, 73 V.I. at 460 (explaining that "clear error is a very deferential standard"). Accordingly, the

Superior Court did not err in holding that Dr. Wrensford would be irreparably harmed by the denial

of the injunctive relief pertaining to her employment and clinical privileges.

¶ 50    However, this Court has the following concerns regarding the injunctive relief pertaining

to Dr. Wrensford's payroll and sick leave benefits reinstatement. First, the Hospital Party argues

that the Superior Court "provide[d] no explanation or justification for the additional requirement

of the injunction order requiring [RLSH] to reinstate [Dr. Wrensford] to the payroll" and points

out that "in the event that she ultimately prevails on her claim compensating [Dr. Wrensford] for

any income lost as a result of the suspension or termination of her employment would be a 'matter

of simple mathematical calculation' easily and completely remedied by an award of monetary

---

apply for positions outside the Virgin Islands is significantly complicated by the report to the National Board. Wrensford's liberty interest may also be impacted if certain hospitals refuse to hire Wrensford based on the National Board report generated by a wrongful suspension of clinical privileges based upon concerns about Wrensford's ability to work harmoniously with others. The court has no opinion on whether Wrensford had a duty to quickly rerum to the hospital on the afternoon of May 4 but notes that Odlum, the Chief of Surgery and Wrensford's supervisor, completed his private office duties before reporting to the hospital almost 1.5 hours after he was called. His treatment of the patient was so insignificant that he did not record his actions in the patient's chart. Moreover, Boschulte's letter of May 15, which advised Wrensford of the Collegial Intervention, also stated the Medical Executive Committee has met and it has been determined that the clinical assessment of your competency should be performed by the Chief of your Department first before any further consideration for evaluation by the Medical Executive Committee." Despite this acknowledgment by the MEC that the Chief of Wrensford's Department – that being Odlum – would perform a clinical assessment, the court received no evidence that such a clinical assessment was perfumed. This supports the finding for a preliminary injunction since the loss of clinical privileges was not tied to any finding of a lack of competency on Wrensford's part.

¶ 63    If the court were to deny the motion for preliminary injunction, a report to the National Board will likely follow. Nothing herein is meant to suggest that RLSH should always be prevented from sending a negative report on a physician to the National Board. Instead, the court finds that in this specific instance where Wrensford's clinical privileges were suspended without proper notice and by an official who had no authority to do so, and the investigation was prompted by a concern about Wrensford's ability to work harmoniously with others and not a finding of lack of competency, necessitates a preliminary injunction.

¶ 64    The court finds that Wrensford's inability to engage in her profession in the Virgin Islands and the potential loss of her reputation without a proper basis for the suspension of clinical privileges, are not compensable by monetary damages. As such, Wrensford has successfully demonstrated a risk of irreparable harm for which a monetary award would be inadequate.

(Footnotes omitted).

*VIGHHFC et al. v. Wrensford*
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 27 of 44

2025 VI 12

damages." The Hospital Party also argues that "the court wholly ignored the fact that, even if terminated by [RLSH], Wrensford would still have the option to continue her career as a surgeon in private practice, either independently, or in association with any one of several private surgical centers located throughout the Virgin Islands."

¶ 51    In the March 1, 2024 memorandum opinion, the Superior Court explained: "RLSH is the only hospital located on St. Thomas. If the court denies the motion for preliminary injunction, Wrensford will be unable to practice her profession in the Virgin Islands. And the intangible cost of a non-voluntary move off-island cannot be calculated." However, the Superior Court—without making any independent fact finding as to whether there are other options on St. Thomas for Dr. Wrensford to continue her career as a physician and general surgeon[23]—simply concluded that "Dr. Wrensford will be unable to practice her profession in the Virgin Islands once her employment with VIGHHFC to work at RLSH [i]s terminated and her clinical privileges thereto [are] suspended." If there are other options on St. Thomas for Dr. Wrensford, then the denial of the injunctive relief pertaining to the reinstatement of Dr. Wrensford to the payroll may not irreparably harm Dr. Wrensford—namely, Dr. Wrensford would be able to continue to practice her profession on St. Thomas, continue to receive income, not be forced to move off-island—and the lost income may simply be "a matter of simple mathematical calculation," inappropriate for injunctive relief. *See Gallery Crown Bay, Inc.*, 68 V.I. at 597 (citations omitted).

¶ 52    Second, as to the reinstatement of sick leave benefits, the Superior Court acknowledged in the March 1, 2024 memorandum opinion—as the Hospital Party points out—that "the sick leave

---

[23] In her complaint, Dr. Wrensford alleged: "Dr. Wrensford is presently employed with [VIGHHFC] as a physician and general surgeon at [RLSH]." (Compl. ¶ 13). In its answer thereto, the Hospital Party admitted this allegation. *See Cianci*, 64 V.I. at 690 n.2 (recognizing that courts may take judicial notice of other courts' dockets and papers); *cf. King*, 61 V.I. at 348.

*VIGHHFC et al. v. Wrensford*         2025 VI 12
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 28 of 44

issue is one of damages; therefore, the court need not address it in its opinion determining if [a] preliminary injunction should be granted." Despite such an acknowledgment and no further discussion regarding Dr. Wrensford's sick leave benefits in the March 1, 2024 memorandum opinion, the Superior Court ordered the Hospital Party to "reinstate all other benefits associated with employment." However, as the Superior Court noted, sick leave benefits may simply be "a matter of simple mathematical calculation," and thus inappropriate for injunctive relief. *See Gallery Crown Bay, Inc.*, 68 V.I. at 597 .

¶ 53    Accordingly, the Superior Court erred in holding that Dr. Wrensford would be irreparably harmed by a denial of the injunctive relief pertaining to payroll and sick leave benefits reinstatement.

### 3. Likelihood of irreparable harm to the nonmoving party

¶ 54    In addressing the third injunction factor, the Superior Court found that "the harm to Wrensford, if the preliminary injunction is granted, far outweighs any harm RLSH will face if the injunction is denied." Thus, the Superior Court held that the Hospital Party "will not suffer greater harm, or any harm, if an injunction is granted in favor of Wrensford."

¶ 55    "In determining whether [the nonmoving parties] will be harmed by an injunction, the Superior Court [i]s required to examine 'whether, and to what extent[,] … the [nonmoving parties] will suffer irreparable harm if the preliminary injunction is issued." *Yusuf*, 59 V.I. at 856 (citation omitted).

¶ 56    Here, a review of the record reveals that the Superior Court's determination that the balancing of the irreparable harms suffered by the moving and nonmoving party favors granting of injunctive relief pertaining to Dr. Wrensford's employment and clinical privileges has

*VIGHHFC et al. v. Wrensford*     2025 VI 12
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 29 of 44

evidentiary support and a rational relationship to the supportive evidentiary data.[24] *See Sam's Food Distribs., Inc.*, 73 V.I. at 460.

¶ 57     The Hospital Party argues that "any prohibition on reporting the suspension of [Dr. Wrensford's] clinical privileges to the [National Practitioner Data Bank] will undoubtedly cause substantial harm to the Hospital because the failure to report constitutes a violation of federal law."[25] This argument is unpersuasive. The Hospital Party fails to acknowledge that, at this juncture, the Superior Court has not permanently enjoined—but only temporarily enjoined—the Hospital Party from reporting the suspension of Dr. Wrensford's clinical privileges until a formal investigation is conducted to determine whether such suspension was justified; if it is determined—after a formal investigation—that it was an unjustified, wrongful suspension, then

---

[24] The Superior Court stated in the March 1, 2024 memorandum opinion:

> ¶ 66     Here, the harm to Wrensford, if the preliminary injunction is granted, far outweighs any harm RLSH will face if the injunction is denied. The Hospital contends that granting the injunction will force RLSH to reinstate Wrensford's Hospital privileges, increasing the possibility of patient injury and exposing the Hospital to reputational damage. The court is not persuaded by the argument that Wrensford's actions or inactions on May 4 posed a significant risk to patient safety or the Hospital or caused any harm to the patient. In fact, Wrensford's supervisor, Odlum, testified that the adjustment to the patient's tubes was so minimal that he did record it in the patient's chart. The court notes, too, that when Odlum was called to the Hospital, he took the time to finish up with his office patients before going to the Hospital and arrived there approximately 1.5 hours after he was called. Odlum testified that when he arrived at the Hospital, the patient was stable and not in distress. This leads the court to find that the patient was not in imminent danger. Testimony also demonstrates that a series of missteps likely contributed to the call for Wrensford to return to the hospital, starting with the radiologist tech's inverted CAT scan (had the images not been inverted Wrenstord would have placed the tubing on the correct side of the chest, and a second tube and attachment to wall suction would not have become necessary), followed by failure of the staff to timely find the necessary equipment to connect the tubes to the wall for suction. Lastly, evidence provided by both parties demonstrates that Wrensford's privileges were suspended not because of any failure or omission in her treatment of the patient but because she did not appoint a member to the ad hoc investigative committee. None of the evidence heard during the evidentiary hearing suggested that Wrensford's treatment of the patient was substandard. As a result, the court finds the Hospital will not suffer greater harm, or any harm, if an injunction is granted in favor of Wrensford.

> (Footnotes omitted).

[25] In its appellant's brief, the Hospital Party pointed out that the March 1, 2024 memorandum opinion and the accompanying order mistakenly referred to the National Board or the Joint Commission instead of the National Practitioner Data Bank as the entity requiring the reporting of suspension.

*VIGHHFC et al. v. Wrensford*  2025 VI 12
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 30 of 44

there would be nothing for the Hospital Party to report. In fact, the Superior Court elucidated this

point in the March 1, 2024 memorandum opinion:

> Nothing herein is meant to suggest that RLSH should always be prevented from sending a
> negative report on a physician to the National Board. Instead, the court finds that in this
> specific instance where Wrensford's clinical privileges were suspended without proper
> notice and by an official who had no authority to do so, and the investigation was prompted
> by a concern about Wrensford's ability to work harmoniously with others and not a finding
> of lack of competency necessitates a preliminary injunction."

¶ 58    The Hospital Party also argues that "the injunction's requirement that the Hospital initiate

its formal investigation within sixty days or forever waive its right to investigate Appellee's actions

is also likely to cause substantial harm to the Hospital." More specifically, the Hospital asserts that

"[e]ven if the Hospital waived its right to investigate solely by virtue of its own, self-inflicted

delay, the balance of harms would still favor the Hospital, as Appellee would lose nothing by the

delay—as she would still receive a paycheck pursuant to that provision of the injunction—while

the Hospital, in the event of waiver under the terms of the injunction, would be greatly

compromised in its ability to ensure safe, competent treatment of its patients." This argument is

without merit. In determining this factor, the Superior Court acknowledged the Hospital Party's

contention that "granting the injunction will force RLSH to reinstate Wrensford's Hospital

privileges, increasing the possibility of patient injury and exposing the Hospital to reputational

damage" and was not persuaded by such an argument. The Superior Court did not commit clear

error by finding that "evidence provided by both parties demonstrates that Wrensford's privileges

were suspended not because of any failure or omission to her treatment of the patient but because

she did not appoint a member to the ad hoc investigative committee" and "[n]one of the evidence

heard... suggested that Wrensford's treatment of the patient was substandard."[26]

---

[26] *See supra* footnote 24.

*VIGHHFC et al. v. Wrensford*
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 31 of 44

2025 VI 12

¶ 59    Accordingly, the Superior Court did not err in holding that a balance of the irreparable harms favors granting injunctive relief pertaining to Dr. Wrensford's employment and clinical privileges. However, the Superior Court erred in holding that a balance of the irreparable harms favors granting injunctive relief pertaining to payroll reinstatement since the Superior Court did not make the necessary finding as to whether the lost income "is a matter of simple mathematical calculation" or an irreparable harm. Additionally, the Superior Court also erred in holding that the balance of the irreparable harms favors granting injunctive relief pertaining to sick leave benefits reinstatement since the Superior Court acknowledged that "the sick leave issue is one of damages" that is inappropriate for injunctive relief.

### 4. Public interest

¶ 60    Finally, in addressing the last injunction factor, the Superior Court found that the "public interest . . . favors Wrensford because she has demonstrated a reasonable probability of success on the merits and irreparable harm." The Superior Court held that "it's in the public's interest to grant the injunction and encourage VIGHHFC and its hospitals to adhere to the laws of the Virgin Islands and the Hospital Bylaws."

¶ 61    With regard to the public interest, this factor will typically favor the moving party "if [it] demonstrates both a likelihood of success on the merits and irreparable injury." *3RC & Co.*, 63 V.I. at 557 (quoting *Yusuf*, 59 V.I. at 858 n.11 (quoting *American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994))). "In considering the public interest, courts should seek to prevent the parties from halting 'specific acts presumptively benefiting the public . . . until the merits [can] be reached and a determination made as to what justice require[s].'" *Yusuf*, 59 V.I. at 858 (quoting *Cont'l Grp., Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 358 (3d Cir. 1980)).

*VIGHHFC et al. v. Wrensford*         2025 VI 12
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 32 of 44

¶ 62    Here, the Superior Court correctly concluded that Dr. Wrensford demonstrated both a likelihood of success on the merits and irreparable injury as to the injunctive relief pertaining to her employment and clinical privileges.[27] Accordingly, the Superior Court did not err in holding that public interest weighed in favor of granting injunctive relief pertaining to Dr. Wrensford's employment and clinical privileges. *See 3RC & Co.*, 63 V.I. at 557; *see also, Yusuf*, 59 V.I. at 857-59 (affirming the Superior Court's finding that the public interest weighed in favor of the injunction when the moving party satisfied the other factors and the continued employment of 600 Virgin Islanders was at stake).

¶ 63    However, given that the Superior Court did not make the necessary finding as to whether Dr. Wrensford's lost income as the result of not being reinstated on the payroll is an irreparable harm and the Superior Court's acknowledgment that the "sick leave issue is one of damages," the Superior Court erred in holding that public interest weighed in favor of granting injunctive relief pertaining to the reinstatement of Dr. Wrensford to the payroll and Dr. Wrensford's sick leave benefits.

---

[27] The Superior Court stated in the March 1, 2024 memorandum opinion:

> ¶ 68    In this case, the public interest factor favors Wrensford because she has demonstrated a reasonable probability of success on the merits and irreparable harm. The Hospital asserts that Wrensford's conduct fell below an applicable standard of care and reinstating her would not be in the public interest. However, nothing in the record demonstrates her skills, particularly as a general surgeon, have fallen below a standard of care. In fact, Boschulte informed Wrensford that the "investigation will not address your technical abilities as a surgeon." Testimony evidence concerning the events of May 4 indicates that the patient's initial CAT scan was inverted. From the outset, Wrensford had repeatedly requested medical devices to stabilize that patient before transfer off island. When Odlum, Wrensford's supervisor, was called to the Hospital to tend to the patient, he found the patient stable and not in any distress. Odlum's treatment of the patient was so insignificant that he did not record it in the patient chart. Moreover, the public has an interest in requiring the Hospital to correctly follow the procedures outlined in the Hospital Bylaws before sanctioning a public employee. Accordingly, it's in the public's interest to grant the injunction and encourage VIGHHFC and its hospitals to adhere to the laws of the Virgin Islands and the Hospital Bylaws.

> (Footnotes omitted).

*VIGHHFC et al. v. Wrensford*
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 33 of 44

2025 VI 12

5. *Balancing of factors*

¶ 64    Because the Superior Court did not err in finding that Dr. Wrensford has a reasonable probability of success on the merits of her procedural due process claim, that she would likely suffer irreparable harm absent an injunction pertaining to her employment and clinical privileges, that the Hospital Party would not be harmed by granting such an injunction, and that granting such an injunction is in the public interest, the Superior Court did not abuse its discretion in granting a preliminary injunction pertaining to Dr. Wrensford's employment and clinical privileges.

¶ 65    On the other hand, the Superior Court abused its discretion in granting a preliminary injunction pertaining to Dr. Wrensford's payroll reinstatement because the Superior Court did not make a finding on each of the four factors as required and therefore did not properly balance the factors. *See 3RC & Co.*, 63 V.I. at 557 (quoting *Yusuf*, 59 V.I. at 847) ("In conducting this sliding-scale analysis, the Superior Court must make findings on each of the four factors and determine whether — when the factors are considered together and weighed against one another — the moving party has made 'a clear showing that [it] is entitled to [injunctive] relief.'"); *see also, Streibich*, 74 V.I. at 499 ("An abuse of discretion arises only when the decision rests upon a clearly erroneous finding a fact, an errant conclusion of law or an improper application of law to fact.") (citations omitted). Additionally, the Superior Court abused its discretion in granting a preliminary injunction pertaining to Dr. Wrensford's sick leave benefits reinstatement because the Superior Court acknowledged that the "sick leave issue is one of damages," which means that Dr. Wrensford has an adequate remedy at law and thus, it is inappropriate for injunctive relief. *See 3RC & Co.*, 63 V.I. 553 ("This is why a party seeking injunctive relief must demonstrate that the injunction is necessary to avoid 'certain and imminent harm for which a monetary award does not adequately

*VIGHHFC et al. v. Wrensford*
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 34 of 44

2025 VI 12

compensate' — in other words, harm without an adequate legal remedy.") (quoting *Yusuf*, 59 V.I. at 854 (internal quotation marks and citation omitted)).

## D. Scope of the Preliminary Injunction

¶ 66    This Court will now turn to the parties' arguments concerning whether the Superior Court erred in determining the scope of the injunction.

¶ 67    "A court has a great deal more flexibility in considering equitable remedies than it does in considering legal remedies because the court of equity has traditionally had the power to fashion any remedy deemed necessary and appropriate to do justice in a particular case." *3RC & Co.*, 63 V.I. at 553 (internal quotation marks and citations omitted); *see Sam's Food Distribs., Inc.*, 73 V.I. at 471 (acknowledging that "a court of equity enjoys wide latitude in fashioning equitable remedies"). Nevertheless, "[a] court issuing an injunction must ensure that it is narrowly tailored 'to fit the particular circumstances of the case.'" *Sam's Food Distribs., Inc.*, 73 V.I. at 471 (quoting *Caribbean Healthways, Inc. v. James*, 55 V.I. 691, 700 (V.I. 2011) (quoting *Brow v. Farrelly*, 994 F.2d 1027, 1038 (3d Cir. 1993))). "Indeed, an injunction cannot be broader than necessary to restrain the unlawful conduct." *Id.* (internal quotation marks and citations omitted).

¶ 68    The Hospital Party argues that the Superior Court erred by granting a preliminary injunction: ordering the reinstatement of Dr. Wrensford to the payroll; enjoining the Hospital Party from reporting Dr. Wrensford's clinical privilege suspension; and ordering the Hospital Party to initiate a formal investigation in sixty days or waive its right thereto.

*VIGHHFC et al. v. Wrensford*                    2025 VI 12
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 35 of 44

¶ 69    Dr. Wrensford argues that the Superior Court erred by granting a preliminary injunction: ordering that the Hospital Party has "the right to initiate a formal investigation" and "link[ing] the order enjoining termination to the 'completion of the formal investigation'"; ordering that the Hospital Party has "the discretion to not reinstate Wrensford's clinical privileges until the formal investigation is completed"; and not "immediately order the injunctive relief sought" such as the "immediate restoration of Dr. Wrensford's privileges and to place her on the on-call schedule."

¶ 70    This Court will address the parties' arguments in turn.

*1.  The Hospital Party's argument regarding reporting Dr. Wrensford's clinical privilege suspension*

¶ 71    The Hospital Party argues that the Superior Court erred in "prohibiting the Hospital from sending a negative report" because "the court did not identify, in its discussion of the likelihood of success on the merits, any claim presented by Appellee that would legally entitle her, if successful, to prevent the Hospital from reporting her suspension" and "no such claim exists because . . . the Hospital is legally required to report any suspension of clinical privileges [pursuant to federal statute]."

¶ 72    We already addressed the Hospital Party's argument as to its reporting requirement under the federal law in our review of the third injunction factor. As noted above, at this juncture, the Superior Court did not permanently enjoin the Hospital Party—but only temporarily enjoined the Hospital Party—from reporting the suspension until a formal investigation is conducted to determine whether such suspension of Dr. Wrensford's clinical privileges was justified.

¶ 73    Moreover, as also noted above, the Superior Court did not err in holding that Dr. Wrensford has demonstrated a reasonable probability of success on the merits of her procedural due process claim. In other words, the Superior Court correctly determined that Dr. Wrensford has a property

*VIGHHFC et al. v. Wrensford*     2025 VI 12
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 36 of 44

interest in her clinical privileges and that Dr. Wrensford is more likely than not to succeed in her claim that the Hospital Party suspended her clinical privileges without providing her constitutionally sufficient notice and an opportunity for hearing. This is directly tied to the reporting of Dr. Wrensford's clinical privileges suspension because there is a reasonable chance that Dr. Wrensford will succeed in her claim that the suspension of her clinical privileges was the result of a due process violation. Upon Dr. Wrensford being afforded due process via a formal investigation, the Hospital Party can then properly determine whether the suspension of Dr. Wrensford's clinical privileges was warranted. If it was not warranted, then there will be nothing to report; and if it was warranted, then the Hospital Party can report the suspension as required.

¶ 74     Accordingly, in enjoining the Hospital Party from reporting Dr. Wrensford's clinical privilege suspension pending the completion of the formal investigation, the preliminary injunction did not exceed the scope of that required to serve the injunction's purpose in the case. *see Sam's Food Distribs.,* 73 V.I. 471. Thus, the Superior Court did not err in this regard.

    *2.  The Hospital Party's argument regarding reinstating Dr. Wrensford to the payroll*

¶ 75     The Hospital Party argues that the Superior Court erred in "requiring the Hospital to reinstate Appellee to the payroll" because "the Superior Court did not address how a failure to immediately place Appellee back on the payroll would result in irreparable harm that could not be compensated" since "lost income is a matter of simple mathematical calculation that is easily and fully compensable with an award of monetary damages."

*VIGHHFC et al. v. Wrensford*        2025 VI 12
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 37 of 44

¶ 76    This argument was addressed above in our review of the Superior Court's preliminary injunction analysis. We concluded that the Superior Court abused its discretion in granting a preliminary injunction pertaining to the reinstatement of Dr. Wrensford to the payroll because the Superior Court did not make a finding on each of the four factors as required and therefore did not properly balance the factors.

> 3.   *The Hospital Party's argument regarding a sixty-day requirement to initiate formal investigation or waiver thereof; Dr. Wrensford's argument regarding the formal investigation component*

¶ 77    The Hospital Party argues that the Superior Court erred in "requiring the Hospital to initiate formal investigation within sixty days or waive the right to conduct such an investigation" because the court "does not mention or consider this issue in any of the various sections analyzing the injunction factors" and "[n]either Appellee nor the Superior Court ha[s] identified anything in the provisions of the relevant statutes, bylaws, rules, or in the law of due process, that would support such a requirement."

¶ 78    Dr. Wrensford argues that "there appears [to be] no rational basis from the record that supports or explains the orders regarding the formal investigation," especially since the Hospital Party "never requested or argued for reinitiating the formal investigation, so it is baffling as to why the reinstatement of formal investigation is a part of the order, and it serves no purpose to address the harm caused by the wrongful conduct." Dr. Wrensford also pointed out that the Superior Court "did not set a deadline for the completion which was indefinitely."

¶ 79    Before we reach the Hospital Party's argument regarding the sixty-day requirement to initiate formal investigation or waiver thereof, we will first address Dr. Wrensford's argument regarding the formal investigation component of the preliminary injunction. Per the Superior Court's preliminary injunction order, the Hospital Party—pending the completion of the formal

*VIGHHFC et al. v. Wrensford*                    2025 VI 12
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 38 of 44

investigation—is enjoined from terminating Dr. Wrensford's employment, is enjoined from reporting Dr. Wrensford's clinical privilege suspension, and is granted the discretion to not reinstate Dr. Wrensford's clinical privileges but must reinstate Dr. Wrensford to the payroll in the interim.

¶ 80    As noted above, the crux of the dispute pertaining to Dr. Wrensford's request for injunctive relief is whether the Hospital Party unlawfully suspended her clinical privileges and terminated her employment in violation of due process. This means that the wrongful conduct that Dr. Wrensford complained about in seeking injunctive relief was not the termination of her employment or the suspension of her clinical privileges per se, but that the Hospital Party did so without providing her constitutionally sufficient notice and an opportunity for a hearing.

¶ 81    By including the formal investigation component, the Superior Court took into consideration Dr. Wrensford's interest in being afforded due process—sufficient notice and opportunity for a hearing—before the termination of her employment and the suspension of her clinical privileges, which is especially important since such disciplinary actions would negatively affect her livelihood. At the same time, the Superior Court also took into consideration the Hospital Party's interest in ensuring the safe and effective treatment of its patients by imposing sanctions against employees for improper conduct in violation of the applicable laws, rules, and regulations—such as suspension of clinical privileges and termination of employment, depending on the gravity of the violation.[28]

---

[28] The Superior Court stated in the March 1, 2024 memorandum opinion:

*VIGHHFC et al. v. Wrensford*     2025 VI 12
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 39 of 44

¶ 82   A formal investigation into the events of May 4, 2023 would satisfy the interests of both parties: Dr. Wrensford would be afforded due process and the Hospital Party would still be able to impose a sanction against Dr. Wrensford if the formal investigation determines that her conduct was in violation of the applicable laws, rules, and regulations and warrants the termination of her employment and suspension of her clinical privileges; on the other hand, if the formal investigation determines that Dr. Wrensford's conduct was not in violation of the applicable laws, rules, and regulations, then no sanctions are warranted. It is unquestionably in the interest of everyone—Dr. Wrensford, the Hospital Party, and the public—that sanctions are imposed against employees only when warranted.

¶ 83   To put it another way, by including the formal investigation component to afford Dr. Wrensford due process and seek the truth about the events of May 4, 2023 so that the Hospital Party can properly determine whether the termination of Dr. Wrensford's employment and the suspension of Dr. Wrensford's clinical privileges were warranted, the Superior Court ensured fundamental fairness and the proper administration of justice. This is certainly within the court's equity power. *See 3RC & Co.*, 63 V.I. at 553 (Because "[a] court of equity has traditionally had the power to fashion any remedy deemed necessary and appropriate to do justice in [a] particular case," a court has a great deal more flexibility in considering equitable remedies than it does in considering legal remedies.) (citations omitted).

---

At some point Wrensford asserted that the Court should prevent the Hospital from continuing with a formal investigation. But were the court to preclude any further investigation and simply restore Wrensford's clinical privileges and place her back on payroll, it would preclude the hospital from doing its investigation and send a signal that the court finds that Wrensford's actions are above reproach. That is not the intent here. The court has no opinion on whether Wrensford should have been a subject of a peer review or formal investigation. But Medical Staff is subject to oversight by the Medical Executive Committee, the CMO, the CEO and the Board. It would be a grave error for this court to preclude them from performing their duties. In addition, barring further investigation could set an improper precedent for other medical staff to potentially argue that they should not be subject to formal investigation.

*VIGHHFC et al. v. Wrensford*    2025 VI 12
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 40 of 44

¶ 84    We now turn to the sixty-day requirement to initiate formal investigation or waiver thereof in the March 1, 2024 order. Had the Superior Court not placed a deadline for the Hospital Party to initiate the formal investigation, the preliminary injunction could be rendered meaningless. In the absence of a deadline for the Hospital Party to initiate the formal investigation, the Hospital Party would technically never run afoul of the injunction since it had unlimited, unspecific time to initiate the formal investigation.

¶ 85    Similarly, the preliminary injunction could also be rendered meaningless in the absence of a completion deadline because the Hospital Party would technically never run afoul of the injunction—as long as it initiates the formal investigation within 60 days, even if the formal investigation is never completed—since it had unlimited, unspecific time to complete the formal investigation.

¶ 86    It is also certainly within the Superior Court's equity power to set a time limit to avoid the unnecessarily prolongment of Dr. Wrensford's fate in legal limbo. Accordingly, in including a formal investigation component and the sixty-day requirement to initiate formal investigation or waiver thereof, the preliminary injunction did not exceed the scope of that required to serve the injunction's purpose in the case. *See Sam's Food Distribs.,* 73 V.I. at 471. Thus, the Superior Court did not err. However, by not including a completion deadline for the formal investigation, the injunction was not narrowly tailored to remedy the irreparable harm alleged, and thus the Superior Court erred in this respect.

*VIGHHFC et al. v. Wrensford*　　　　　　　　2025 VI 12
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 41 of 44

       *4. Dr. Wrensford's argument regarding the Hospital Party's discretion to reinstate her*
       *clinical privileges instead of immediate reinstatement pending the completion of formal*
       *investigation*

¶ 87　Dr. Wrensford argues that "[b]ecause [she] satisfied all of the foregoing factors, and [sic] correctly ruled that [her] privileges were wrongfully suspended and that she demonstrated that 'she is entitled to have her clinical privileges immediately restored,' these circumstances require the Superior Court [to] order the immediate reinstatement of [her] privileges and related injunctive relief." Dr. Wrensford further argues that "[t]here is no reason for the court to . . . give the Defendants the 'discretion to decide' when Wrensford should have her privileges restored when the Court already ruled that she was entitled to have it restored immediately, along with the related injunctive relief sought," which in turn, "places [her at] continued risk of further irreparably injury every day that she remains without her privileges and on-call work and is deprived of her ability to engage in her profession, and there is no possible reason to justify it."

¶ 88　As the Superior Court pointed out in its March 1, 2024 memorandum opinion, the Hospital Party did not suspend Dr. Wrensford's clinical privileges due to concerns about the competency of her surgical skills.[29] In fact, Dr. Boschulte's correspondence to Dr. Wrensford made it clear that the suspension of Dr. Wrensford's clinical privileges was due to her failure to appoint a member to the ad hoc investigative committee by the given deadline, and that the suspension remains until

---

[29] The Superior Court stated in the March 1, 2024 memorandum opinion:

    …Lastly, evidence provided by both parties demonstrates that Wrensford's privileges were suspended not because of any failure or omission in her treatment of the patient but because she did not appoint a member to the ad hoc investigate committee. None of the evidence heard during the evidentiary hearing suggested that Wrensford's treatment of the patient was substandard.

*VIGHHFC et al. v. Wrensford*          2025 VI 12
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 42 of 44

she appoints a member as requested.[30] Arguably, the suspension of Dr. Wrensford's clinical privileges may not even be warranted, depending on the results of the formal investigation.

¶ 89    Accordingly, by granting the Hospital Party the discretion to reinstate—rather than ordering the Hospital Party to immediately reinstate—Dr. Wrensford's clinical privileges, the injunction was not narrowly tailored to remedy the irreparable harm alleged, which was that the Hospital Party suspended her clinical privileges without providing her constitutionally sufficient notice and an opportunity for a hearing. *See Sam's Food Distribs.*, 73 V.I. at 471. Thus, the Superior Court erred.

## III. CONCLUSION

¶ 90    The Superior Court did not abuse its discretion in granting a preliminary injunction pertaining to Dr. Wrensford's employment termination and clinical privileges suspension. However, the Superior Court abused its discretion in granting a preliminary injunction pertaining to Dr. Wrensford's payroll reinstatement and Dr. Wrensford's sick leave benefits reinstatement. Additionally, portions of the injunction identified above in this Opinion exceeded the scope required to serve its purpose in this case. Thus, we affirm in part and remand in part the Superior Court's March 1, 2024 order as follows:

---

[30] In Dr. Boschulte's June 21, 2023's email, she indicated that ad hoc investigative committee to conduct an investigation which "will not address [her] technical abilities as a surgeon[,] [i]t specifically will address the situation surrounding your response to requests made by staff to return to the emergency room..." In Dr. Boschulte's August 3, 2023 letter, she indicated that due to Dr. Wrensford's failure to appoint a member to the ad hoc investigative committee by the given deadline, Dr. Wrensford's clinical privileges are suspended until she appoints a member as requested. In Dr. Boschulte's November 17, 2023 letter, she indicated that Dr. Wrensford's "failure to appoint a member to the Ad Hoc Investigating [sic] Committee leading to your suspension for more than 90 days has resulted in automatic resignation from the Medical Staff."

*VIGHHFC et al. v. Wrensford*
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 43 of 44

2025 VI 12

¶ 91    We affirm the portion of the Superior Court's March 1, 2024 order granting a preliminary injunction enjoining the Hospital Party "from terminating [Dr. Wrensford] pending completion of the formal investigation and ultimate Board action."

¶ 92    We also affirm the portion of the Superior Court's March 1, 2024 order granting a preliminary injunction enjoining the Hospital Party "from sending a negative report to the National Practitioner Data Bank, pending completion of the formal investigation" but correct the reporting entity by replacing "The Joint Commission" with "National Practitioner Data Bank."[31]

¶ 93    We remand the portion of the Superior Court's March 1, 2024 order granting a preliminary injunction ordering the Hospital Party to "place Wrensford back on the payroll and reinstate all other benefits associated with employment within twenty (20) days of entry of this Order" so that proper findings can be made for each of the four preliminary factors and thereafter balanced against each other as to the injunctive relief pertaining to Dr. Wrensford's payroll reinstatement and sick leave benefits reinstatement.

¶ 94    We vacate the portion of the Superior Court's March 1, 2024 order granting a preliminary injunction ordering that the Hospital Party has "the discretion to not reinstate Wrensford's clinical privileges until the formal investigation is completed, but in the interim, shall place and maintain Wrensford on the payroll pending the completion of the investigation" and remand to the Superior Court with instructions for the immediate reinstatement of Dr. Wrensford's clinical privileges.

¶ 95    Lastly, we also affirm the portion of the Superior Court's March 1, 2024 order granting a preliminary injunction ordering that the Hospital Party has "the right to again initiate a formal investigation, provided they do so within sixty (60) days of entry of this Order, failing which they

---

[31] *See supra* footnote 25.

*VIGHHFC et al. v. Wrensford*
S. Ct. Civ. No. 2024-0022
Opinion of the Court
Page 44 of 44

2025 VI 12

will be deemed to have waived the formal investigation," but remand to the Superior Court with

instructions for the inclusion of a completion deadline for the formal investigation.

Dated this ___19ᵗʰ___ day of ___May___, 2025.

BY THE COURT:

**HAROLD W.L. WILLOCKS**
**Associate Justice**

ATTEST:

**VERONICA J. HANDY, ESQ.**
**Clerk of the Court**
By: _____

  **Deputy Clerk II**
Dated: ___5-19-2025___